## UNITED STATES v. 122 ACRES OF LAND IN TOWN OF HEMPSTEAD, NASSAU COUNTY, N. Y., et al.

## SAME v. 40 ACRES OF LAND IN TOWN OF HEMPSTEAD, NASSAU COUNTY, N. Y., et al.

Miscellaneous Nos. 681, 687.

District Court, E. D. New York.

Nov. 17, 1943.

Harry T. Dolan, Sp. Asst. to Atty. Gen. (Thomas J. Gallagher, Sp. Atty., Department of Justice, of Brooklyn, N. Y., of counsel), for petitioner-plaintiff.

Patterson & Christ, of Hempstead, L. I., N. Y. (Harvey J. George, of Hempstead, L. I., N. Y., of counsel), for Andrew N. Miller.

Skinner & Bermant, of New York City (Bernard L. Bermant, of New York City, of counsel), for Delano Park, Inc., and Delano Park Homes, Inc.

Roe & Kramer, of New York City (Clinton Roe, of New York City, of counsel), for John J. Halleran.

BYERS, District Judge.

The proceedings under the above titles concern the taking of property by the government in connection with Mitchell Field in Nassau County somewhat east of Hempstead.

Miscellaneous No. 687 was settled after being called for trial.

I have visited and inspected these several properties since the testimony was closed.

The first named cause involves two damage parcels: B, containing 8 acres, and A, containing 120 acres. These were part of the original Santini holdings comprising about 260 acres lying generally at Front Street and Merrick Avenue, on the south, the easterly side extending along Merrick Avenue northerly to Bethpage Turnpike which seems also to be known as Fulton Avenue, which latter highway constituted the northern boundary of the property. It was formerly part of the Cold Stream Golf Club, which means that it contained but few buildings.

The government took possession of these damage parcels under an order dated May 14, 1942, and the Declarations of Taking

were filed on December 19 and 28, 1942, as of which it is the duty of the court to ascertain the fair value of the properties so acquired.

In the northerly section of the original 260 acres, an irregular shaped parcel comprising 76 acres was acquired by the government through purchase, and that parcel having a frontage on Bethpage Turnpike juts into damage parcel A for about two-thirds of its width, in such a way as to leave a shallow frontage for a portion thereof, fronting on Bethpage Turnpike, according to the following diagram made from an exhibit:

sold at various prices up to $6400 during the years 1939 and 1940.

No buildings were ever erected on damage parcel B, however; that is to say, the development came to a halt at the end of 1940. The president of Delano Park Inc. died during the early part of that year, but what influence that event had upon the operations of the company has not been made to appear.

It should be stated that damage parcel B comprises 43 building lots according to a Map of Delano Park Homes, owned by Delano Park Homes Inc.; and 1 plot and 8 irregular narrow strips on the north and

The dotted line areas added to damage parcels A and B indicate the original Santini tract. That portion marked "H. 40 acres" shows the parcel embraced in Miscellaneous No. 687 settled as above stated.

Damage parcel B is a portion of a 26.9 acres purchase in 1938 from Santini, consisting of B as shown, and the adjacent 18.9 acres which were acquired by Delano Park Inc. for residential development. Much of the 18.9 acres was so improved, by the erection of 47 dwelling houses which

east boundaries of this damage parcel were owned by Delano Park Inc., which explains that there are two claimants to this parcel, but not why.

The property looks more pretentious on the Map than inspection reveals it to be. The subdivision into lots facing upon paper streets affords a convenient platform upon which to erect appraisals of corner lots, etc., but at the time of the order of possession the streets had not been physically established except as to one running east and

west at the southerly end of the damage parcel. That had been opened, but not surfaced, and water pipes had been laid, and one hydrant erected, but otherwise the property actually was in acreage. The roadway mentioned is a convenience to the houses facing it on the improved portion of the 18.9 acres not here involved, but does not change the character of property lying to the north of it, with which this proceeding is concerned.

Not only had there been no development of damage parcel B at the time of possession or taking, but from and after March, 1942, according to the testimony, building materials were not available for the erection of houses except under the grant of priority for defense housing, by the appropriate agencies of the federal government.

No such priorities had been granted, and it is revealed in the testimony that F. H. A. loans could not be secured, because of the direct proximity of the property to a flying field, which is what Mitchell Field is.

The question arises as to whether the impossibility of applying this property to its best use, by reason of the non-availability of building materials under the priority restrictions, can be considered by the court in seeking to arrive at its fair market value.

Since the same subject is presented in connection with damage parcel A, brief discussion seems to be required.

It is argued for the claimants of parcel B, that the government may not urge that the restrictions which it has promulgated may be deemed to adversely affect the market value of property which it has condemned for governmental use, because the margin of shrinkage would constitute pro tanto confiscation, contrary to the constitutional rights of the owners.

It is said that, if the government by legislation and regulation can prohibit certain uses of the property, and then be made to pay on the basis of the reduced value only, it could also prohibit any use whatever and claim the right to acquire a useless property without paying anything, because of its lack of value.

I have been unable to find any decision which passes upon this question, because it seems not to have arisen in the zoning cases which would furnish the closest analogy to such a restriction as is here involved; that is, no case has been found in which a municipality has condemned property for its own use, after having first subjected it to zoning restrictions.

While the argument of the claimants is logical enough, it is less than convincing.

In the first place, the impact of the priorities affecting building materials is not directed against this parcel of land, or any real estate whatever; true, it happens to fall upon this and all other undeveloped tracts, but that is a temporary condition, born of necessities, the neglect of which might lead to the destruction of all institutions of our government, including those which call for just compensation for property necessarily acquired by the government in the discharge of its responsibilities.

Secondly, an expert witness testifying for these claimants stated that the opinions expressed by him, as to the fair value of this parcel at the taking, were based in part upon his belief that priorities could have been secured for the erection of suitable dwelling houses upon this property, and if he was mistaken in that, his values would be reduced by one-third.

In the practical sense, it would be idle to ignore the limitation upon real estate development, arising from the imposition of priorities governing the availability of housing materials for general purposes. Lots which otherwise might have been improved by the erection of houses became inert holdings, and their value was thereby measurably impaired, and nothing much could be done about it so long as the priorities remained in operation.

Not only was this recognized by the owners, but probably as a salvage effort the top-soil from about one-half of these 8 acres was stripped and sold, that is, from the northerly half of the property.

Adequate improvement of these plots involved not only the building of houses, but the presence of lawns upon so much of the property as was not covered by structures, and roads or paths; the testimony seems to be that about 65% of a building plot would require the presence of top-soil. The entire stripping of the northerly 4 acres would perhaps leave enough in the southerly half to supply the needs of both sections, when, if and as houses should be erected, but the stripping deprived the denuded property of so much of its fair value as would be based upon the presence of top-soil.

The testimony is that the latter is worth about $300 per acre.

In reaching a conclusion as to the fair value of these 8 acres, consideration has been given to sales of all other properties referred to in the testimony of witnesses, as comparable.

In that connection, it is necessary to state that none presents a case of arrested real estate development as in the Delano property, as to which the circumstances have been related. Where a building project is carried forward in one section of a property, and then comes to a halt, the fair value of the remaining section, for that particular use, is thereby rendered problematical; which means that opinions will necessarily differ concerning what would have been the probable future course of the undeveloped area if uninfluenced by such exterior causes as have here been encountered.

The claimants' value is stated at about $2200 per acre, based on lot values according to the said Map. A shrinkage of one-third for lack of the procurement of building priorities reduces this to around $1500 per acre.

The government's witness values 4 acres at $2190 containing top-soil, and 4 acres at $1260 from which the top-soil had been stripped, plus $300 for the 1 plot and the 8 irregular shaped strips owned by Delano Park Inc., or $3750 in all.

The testimony of the government's witness was the more persuasive of the two, and the award in connection with damage parcel B is fixed at $3840 to Delano Park Homes Inc. and $300 to Delano Park Inc., plus interest at the rate of 6% per annum, from May 14, 1942, the date of the taking of possession, to and including December 19, 1942, the date of the vesting of title under the Declaration of Taking.

As to damage parcel A, there is no element of blighted hopes due to inability to carry to completion a partially executed plan of residential development, as in the Delano property.

Here the claimant entered into a contract on April 23, 1942, for the purchase of this property at $18000 plus $2000 brokerage, with a stipulation to the effect that condemnation proceedings, if initiated intermediate the date of contract and the taking of title, should not affect the vendee's duty to perform. The average price per acre was $150.

The order for taking possession was entered as has been stated, on May 14, 1942, well in advance of the closing of title.

The purchaser therefore was apprised of the extreme unlikelihood of his being able to develop this tract as he had others, and the only practical question is whether the price he paid represented the fair market value of the property. Certainly it is convincing evidence on that subject, which cannot be lightly brushed aside.

The vendor was not forced to sell; perhaps she was anxious to liquidate so much of her holdings, and the testimony of her attorney supports the inference that such was her state of mind. Nothing, however, is shown to indicate that duress of financial circumstance played any part in her action, but rather a loss of patience in view of the series of legal incidents attending her ownership of the entire original tract, which are related in some detail in Mr. Carver's testimony.

About 80 acres of the 120 had been completely stripped of top-soil, which in the Hempstead area is rich and greatly in demand.

The calculation of the fair value of the property is to be governed by these known factors, and by some consideration of comparable sales; also by an understanding to be attributed to the claimant, that the only use to which the property would lend itself would be for residential improvement, in the event that occupancy by the government as forecast by the contract should not take place. This means that he also understood that the inability to procure building ma terials through the award of priorities would indefinitely postpone putting the property upon an earning basis.

This damage parcel rises gradually in elevation in a northerly direction, being at about the street level on Front Street except for the westerly part which is occupied by the bed of a stream, where the land is low. In that part of the property permanent buildings could not be erected because of difficulty in constructing waterproof foundations. There were ornamental shade trees in the Front Street area, some of which could have been retained in laying out a residential building project.

At the time of taking there were buildings on the property, as follows:

"a two and one-half story brick dwelling,

"a two-story stable,

"two one-family semi-attached frame dwellings,

"a water tower,

"a cold storage building,

654

"a large barn,
"a hay barn, and garage,
"a workmen's bungalow, and
"a greenhouse".

The first listed is a substantial structure which added to the value of the land, in that it could have housed office facilities in connection with a development enterprise. The others were of no permanent value, and were useful only for salvage of timbers or lumber which perhaps could have been used for scaffolding or the like. Otherwise they added nothing to the value of the land.

The values assigned to these frame buildings by the claimant's expert were not based upon visual observation, because he did not inspect the property until long after they had been demolished.

The testimony of the opposing witnesses and the data forming the bases of their opinions as stated, have been weighed in the light of the conditions above recited, with the result that the value as stated by the claimant's expert of $107500, for a property which was acquired in May of 1942 for $18000 plus brokerage, is so manifestly incongruous that it makes no helpful contribution to the task at hand. Having in mind that there are two parties to the controversy, and that fairness to each is requisite in this as in all other judicial action, the conclusion is reached that the fair value of the land in this parcel was $30000, and that the brick structure was reasonably worth $5000 and the other miscellaneous buildings had the nominal value of $1000 as a whole; the award will be $36000 plus interest thereon from June 12, 1942 (the date when title passed to the claimant) to and including December 28, 1942, at the rate of 6% per annum.

Perhaps a word should be added to indicate why the average per acre award on these adjoining parcels is not the same:

If it be assumed that the war should end tomorrow, and that on the following day by some process these properties could be returned to their respective owners for development, it would result that as to parcel B the owners could, if financially able, proceed to erect houses conforming to the character of those already built upon the developed portion of the 18.9 acres and according to the layout of streets, etc., as indicated upon the Map in evidence. There would be no waste land, because the 8 acres could be entirely so put to use.

In the case of parcel A, there is an indeterminate portion, probably not less than 20%, which can not be built upon at all. Probably that section could be so apportioned to building sites, as ornamental adjuncts thereto, as to render them attractive, but that would require expert planning and a coherent scheme of development which has not been visualized. The irregular shape of the parcel in its northern section suggests the difficulties which would have to be overcome before the most attractive and feasible use of the property could be plotted. In the 76 acres piece indicated on the sketch appearing herein, there is an unsightly sand pit of large size which does not contribute to the development value of the adjacent parts of parcel A. These are some of the reasons why a different average value has been assigned to the acreage of these two damage parcels.

Settle order.